36 N.J. Super. 95 (1955)
114 A.2d 771
ETHEL L. STICKLES, PLAINTIFF,
v.
EDYTHE MANSS, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 25, 1955.
*97 Mr. Horace F. Banta argued for the motion.
Mr. Robert J.T. Mooney, contra.
FOLEY, J.C.C. (temporarily assigned).
This motion to strike plaintiff's complaint, charging libel, is grounded upon the contention that it fails to set forth a claim for relief.
Plaintiff is the widow of Lloyd C. Stickles to whom she was married on October 24, 1917. Defendant admittedly was his mistress for many years and in his later days was the author of the writings upon which the action is brought. They are four in number and are pleaded in five counts, falsity and malice being alleged in each.
The complaint is attacked broadside upon the assertion that it is in fact an action for alienation of affections redressed as a libel action for purposes of avoiding the barrier of the "Heart Balm Act," N.J.S. 2A:23-1. This approach entirely overlooks the nature of the mischief which the Legislature undertook to remedy in revising the common law by this enactment.
In Grobart v. Grobart, 5 N.J. 161, at page 166 (1950), the court, holding actionable a conspiracy to injure the plaintiff in her marital relations with her husband, to deprive her of her rights in his property by means of fraud and deceit, and inter alia to impair her good name and reputation, said:
"In ascertaining the scope of actions the abolishment of which the `Heart Balm Act' was intended to accomplish, we are aided in our inquiry by the broad principles said to underlie the enactment as *98 expressed in the preamble thereto. A preamble may be resorted to for assistance in arriving at the true intention of the lawmakers where doubt arises as to the construction of the statute. [Citing Blackman v. Iles, 4 N.J. 82 (1950).] It is evident from a reading of the preamble thereto that the purpose of the aforesaid statute is to abolish certain causes of action, i.e., alienation of affections, criminal conversation, seduction and breach of contract to marry, arising out of and dependent upon the marital relation, which causes of action, as stated in the preamble, have subjected our people to `extreme annoyance, embarrassment, humiliation and pecuniary damage.' Experience has shown that these actions have been abused by unscrupulous persons and have served as vexatious vehicles in the perpetration of fraud. This is the evil the legislature intended to remedy by the enactment of the `Heart Balm' statute."
And again, 5 N.J., at page 167:
"* * * We cannot conceive that the statute was designed to deprive plaintiff of redress for such wrongs merely because they are related or incidental to the marital relation. To so conclude would result in placing a strained construction upon the act far beyond the mischief sought to be remedied and cast grave doubts upon its constitutionality, at least to that extent. The intention of the lawmakers was to prevent extortion and blackmail that often accompanied the institution of the actions specifically outlawed by the statute but it was not intended to reach further and prohibit all actions involving property and personal rights not subject to those abuses in which actions married persons are concerned."
In the present case it is quite true that the offensive writings may have been part and parcel of the defendant's invasion of the marital preserve and so would have been evidential in an action for alienation of affections. But it does not follow that since the right to recover damages in such form of action is proscribed they may not suffice to state a claim for relief which exists independently of such action. Alienation of affections struck at the conjugal relationship, and the various means to accomplish it included libel. But libel is itself a wrong the effects of which are measured in terms of disfavor of the repute of the injured individual. Thus it is held that a valid claim of libel is not debarred by reason of the fact that coincidentally it might have supported the now abolished action for alienation of affections.
*99 It is next contended that the complaint is faulty for failure to plead special damages. Supporting argument for this proposition is buttressed by respectable authority adjudicative of slander actions: Ogden v. Riley, 14 N.J.L. 186 (Sup. Ct. 1833); Bartow v. Brands, 15 N.J.L. 248 (Sup. Ct. 1836); Davenport v. Patteson, 98 N.J.L. 65 (Sup. Ct. 1922); Shaw v. Bender, 90 N.J.L. 147 (E. & A. 1916). But the rule is otherwise in libel cases. In Hand v. Winton, 38 N.J.L. 122 (Sup. Ct. 1875), Chief Justice Beasley pointed out that in an action for libel any defamatory matter is per se libelous and no special damage need be proved.
The defendant also urges that the complaint should be stricken because its several counts fail to set forth matter which is defamatory or libelous.
The nature of the allegedly libelous statements and the innuendoes which are said to be explanatory of them do not lend themselves to abridgement. They are set forth:

FIRST COUNT
That on February 5, 1954 the defendant addressed to Stickles a letter received and read by him, which contained the following words:
"`* * * whatever you think of her to me she is wicked and evil. When one hisses as she does, they are possessed of the devil and she and her brother surely are evil looking. They robbed me of my good name in this town and nothing was ever said or done about it.'
4. The defendant did mean and intend by the foregoing words to state that the plaintiff had maliciously libelled and slandered the defendant in Ridgefield Park, New Jersey, and, further, was engaged in occult, supernatural, and evil practices, all of which statements and charges were utterly false and untrue and all of which statements and charges did cause and have caused great damage to the reputation and good name of the plaintiff."

SECOND COUNT
That on July 9, 1954 he received a missive from the defendant, which, in part, read:
*100 "`I don't know my darling why you should have waited and waited to see me at the hospital, after the treatment I received there. Was that beast at the desk a friend of the beast that was sitting in your room? Yes, I had the courage to pass right by her, even though she continued to call `You can't go in there.' I could not hear everything that was said, but I do know the character said `five minutes.' We then entered and you said `yes five minutes.' What a welcome. You travel all those miles to see the man you love, and then to hear it said five minutes. What I thought I would hear was, she can stay as long as she cares to stay, I have waited to see her. I was greatly disappointed and heartbroken. That evil character was even ruling the hospital employees.
`When I called the following morning to see how you were, I received the information from the fifth floor that you had a very bad night, and that you were very ill from the excitement of the previous night. The party who answered the phone, said `If I were you I would not come down to see him again as it does not help his recovery. Was someone paying or giving gifts, to some of those people, to keep me from seeing you? Or did she tell them I was annoying you, and that you did not want to see me there?'
4. The defendant did mean and intend by the foregoing words to state that the plaintiff was holding Lloyd C. Stickles as a prisoner in the hospital and had influenced by bribes of money or otherwise the officials and employees of the said hospital to perform their duties in an improper and wrongful manner so as to prevent visitors from seeing the said Lloyd C. Stickles, all of which statements and charges were utterly false and untrue and all of which statements and charges did cause and have caused great damage to the reputation and good name of the plaintiff."

THIRD COUNT
That on July 13, 1954 the defendant wrote Stickles as follows:
"`Darling even though you are ill you do look so much younger. She looks old enough to be your mother. I do believe she lied to you about her age. She must be at least 10 years older than you. You were always so strong, healthy, and young looking. That is why she put the horns on you.'
4. The defendant did mean and intend by the foregoing words to state that the plaintiff had lied to her husband about her age and had been unchaste and unfaithful to him during the course of their marriage, all of which statements and charges were utterly false and untrue and all of which statements and charges did cause and have caused great damage to the reputation and good name of the plaintiff."

*101 FOURTH COUNT
That on the same day and presumably in the same note she indited:
"`I always think of that story `Rachel,' my torment. She sat so devotedly at the bedside of her sick husband with sweet honey'd words, and kept him a prisoner from everyone for fear some money or some different plans might be made to go elsewhere instead of all for her. It always gave me a feeling that someone was like her in her ways. But I never dream'd of her sitting at your bedside like that and you her prisoner. It really has come to that.'
4. The defendant did mean and intend by the foregoing words to state that the plaintiff had falsely and maliciously and for the purpose of obtaining financial benefits therefrom, caused the late Lloyd C. Stickles to be held as a prisoner, and did further mean and intend to state that the plaintiff was similar to a fictional character named Rachel Ashley, as portrayed in a published and widely sold novel entitled `My Cousin Rachel,' written by Daphne du Maurier, which said fictional character is portrayed in the book as having poisoned her husband, who then died as a result of the said poisoning; and the defendant did mean and intend by those words to state that the plaintiff had poisoned her husband, the late Lloyd C. Stickles, all of which statements and charges were utterly false and untrue and all of which statements and charges did cause and have caused great damage to the reputation and good name of the plaintiff."

FIFTH COUNT
That on July 28, 1954 defendant wrote:
"`Oh! how I pity you, and I know at the hospital they all have her number. They all know she guards you like a prisoner.'
4. The defendant did mean and intend by the foregoing words to state that the plaintiff was holding and keeping Lloyd C. Stickles a virtual prisoner in the hospital for her own purposes and was in fact committing the crime of false imprisonment, of the commission of which said crime the defendant claimed all of the employees of the hospital were aware, all of which statements and charges were utterly false and untrue and all of which statements and charges did cause and have caused great damage to the reputation and good name of the plaintiff."
I have concluded that Counts One, Two, and Five must be stricken for the reasons hereinafter set forth.
*102 In the first count the plaintiff is described as "wicked and evil." These words, standing alone, might well be said to be libelous, but when coupled with what follows  "When one hisses as she does they are possessed with the devil and she and her brother surely are evil looking"  one finds a definition of the supposed evil which collides head-on with a present-day wonderment that witchcraft could ever have been practiced. Yet, this is the innuendo asserted. The words, "They robbed me of my good name in this town * * *," might also in other circumstances and in different context be viewed as actionable. But considering the relationship between the sender and the receiver, fully known to him, and the fact that any subsequent reader would not know of whom the defendant was speaking if only the quoted excerpt was read, defamation of the plaintiff's character in a class of society which the court can recognize is difficult to envision.
The second count rests upon the premise that the plaintiff's wife had made gifts to hospital employees in return for the exercise of their prerogatives of refusing the defendant visitation of her dying paramour. Ordinary understanding of the words employed does not comport with the meaning attributed to them by the pleading.
The fifth count charges that persons in the hospital knew that Stickles was being guarded like a prisoner by the plaintiff. This, it is alleged, amounted to a charge of false imprisonment. Neither the circumstances, the words, nor the rational inferences to be drawn from the combination of them permits the conclusion that the defamation contended for arose therefrom.
Counts three and four are objectionable because of the obscurity of the language which is alleged to be libelous and the failure to impute to the recipient of the missives the possession of the requisite knowledge to draw therefrom the defamatory meanings charged.
It is difficult, indeed, to define a standard by which the libelous or defamatory nature of words is to be measured as a matter of law, considering the variance of circumstances *103 in which they may be uttered, the context in which they may appear, and the understanding of those to whom they may be published.
In Cole v. Grant, 18 N.J.L. 327 (Sup. Ct. 1841), it was said that the words should be given the fair and natural meaning attributed to them by ordinary people. I would add to this that where special knowledge of the intended meaning of a writing makes it libelous in the mind of a reader, its publisher is liable, notwithstanding the fact that the fair and natural meaning derived by ordinary people would not have like effect. But I also believe that where the plaintiff relies upon a showing of such special knowledge or understanding he is bound to plead it, and, failing to do so, is presumed to rest his claim upon the libelous effect of the words (as explained by innuendo) upon the mind of the ordinary person. Judged by these standards the complaint must fall.
It is my view that words contained in the third count charging the plaintiff with "putting the horns on" her husband may have been known by him to be of the significance contended for and, if so, an allegation to this effect would set forth a libel, notwithstanding lack of the same understanding of the expression by the ordinary person.
Likewise, it is entirely possible that by reason of familiarity with "Rachel" (fourth count) the deceased interpreted the reference to her in the manner described by the plaintiff. This special knowledge, if charged, would in my view sustain the count.
Counts three and four will be stricken but with leave to amend in conformity with this opinion.
An appropriate order may be drawn.