39 N.J. Super. 534 (1956)
121 A.2d 749
FELIX MAGIEROWSKI, PLAINTIFF-APPELLANT,
v.
DONALD BUCKLEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 1956.
Decided March 23, 1956.
*538 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Ira D. Dorian argued the cause for appellant (Mr. Matthew Grayson, attorney).
Mr. Saul Neivert argued the cause for respondent (Mr. John T. Glennon, attorney; Mr. Saul Tischler, of counsel on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
The question before us is: Can a father maintain an action for the loss of services of his employed adult daughter, and for punitive damages, by reason of her alleged seduction under a promise of marriage, in view of the provisions of N.J.S. 2A:23-1 et seq., commonly known as the "Heart Balm" Act?
The complaint alleges that plaintiff is the father of Stephanie Magierowski, unmarried and of good repute for chastity, who lived with him and had been employed at a local plant for some 2 1/2 years last past. He charged that shortly after Stephanie became 21, defendant, of age and single, "did, under the promise of marriage," seduce her, *539 and as a result she became pregnant and "was unable to perform her usual tasks and duties, employment, and unable to earn monies as heretofore." The first count sought $25,000 damages for loss of the daughter's services and earnings. By way of second count plaintiff asked $25,000 punitive damages for loss of services, medical and hospital expenses, and for shame, humiliation and nervous shock.
The answer set up by way of separate defenses that N.J.S. 2A:23-1 et seq. was a bar to the action, that plaintiff could not sue for loss of services where the daughter had reached her majority, and further, that she had been emancipated for some period of time. Defendant then moved for an order dismissing the complaint and for summary judgment in his favor, urging the same grounds in support of the motion. The court entered such an order which recited the bar of the cited statute.
Plaintiff argues three points on his appeal: (1) apart from the provisions of N.J.S. 2A:23-1 et seq., he may as father maintain an action for the loss of services of his daughter, though over the age of 21, resulting from her seduction by defendant; (2) N.J.S. 2A:23-1 et seq. does not apply to plaintiff's action, and (3) if the statute be construed to bar the action, it is unconstitutional in that respect. We shall consider the arguments in that order.

I.
Prior to the statute of 1935 (L. 1935, c. 279; R.S. 2:39A-1 et seq., now N.J.S. 2A:23-1 et seq) a female could not bring an action for her own seduction, the reason generally assigned being that having consented to the illicit intercourse she was barred by the application of the maxim, "Volenti non fit injuria." Coil v. Wallace, 24 N.J.L. 291, 315, 318 (Sup. Ct. 1854); Van de Velde v. Colle, 8 N.J. Misc. 782, 784 (Cir Ct. 1930); see also 47 Am. Jur., Seduction, § 80, p. 669; 79 C.J.S., Seduction, § 4, p. 957; 22 Halsbury's Law of England (2d ed. 1936), 247; Tiffany, Domestic Relations (3d ed. 1921), 378; 4 Vernier, American *540 Family Laws (1936), § 252, p. 267; Thibault v. Lalumiere, 318 Mass. 72, 60 N.E.2d 349, 158 A.L.R. 613 (Sup. Jud. Ct. 1945). But it has been held that the presence of peculiar circumstances would support an action by the seduced woman, even in the absence of any modification of the common law: force, duress, or overpowering control or influence used to seduce, see Kirkpatrick v. Parker, 136 Fla. 689, 187 So. 620, 121 A.L.R. 1481 (Sup. Ct. 1939), or a confidential relationship between the parties, or the absence of a parent to bring the action, Welsund v. Schueller, 98 Minn. 475, 108 N.W. 483 (Sup. Ct. 1906). See Annotation, 121 A.L.R. 1487, 1488, 1490 (1939). However, even under the strict rule, if a woman sued for breach of promise to marry, the seduction could be shown in aggravation of the damages sustained. Coil v. Wallace, above, 24 N.J.L., at page 306 ff.; 8 Am. Jur., Breach of Promise to Marry, § 28, p. 868.
Before 1935 there were 14 jurisdictions which by statute changed the common law rule and expressly conferred on the woman the right to sue her seducer for damages if she was then unmarried. 4 Vernier, op. cit., § 252, p. 267. This right was recognized by judicial decision in three jurisdictions on the theory that feigned issues were abolished and the woman was the real party in interest under the statute requiring the real party in interest to bring the action. Watson v. Watson, 49 Mich. 540, 14 N.W. 489 (Sup. Ct. 1883), and Rabeke v. Baer, 115 Mich. 328, 73 N.W. 242 (Sup. Ct. 1897); Hyatt v. McCoy, 194 N.C. 25, 138 S.E. 405 (Sup. Ct. 1927); Johnson v. Harris, 187 Okl. 239, 102 P.2d 940 (Sup. Ct. 1940). See Note, 12 Minn. L. Rev. 190 (1928). Cf. R.R. 4:30-1. The right so given to the woman, by statute or judicial decision, has been criticized as socially unwise and oppressive. Feinsinger, "Legislative Attack on `Heart Balm,'" 33 Mich. L. Rev. 979, 986 (1935). New Jersey has recognized no such right.
An action ex delicto did exist at common law in favor of the parent against the seducer. The law of torts had, of course, long concerned itself not only with the protection of interests of personality and of property, but also with *541 so-called "relational" interests founded upon the relation existing between an individual and one or more other persons. Green, "Relational Interests," 29 Ill. L. Rev. 460 (1935). Interference with the unimpaired continuance of such relation, particularly in the area of relations within the family, was redressed by a tort action. Green, op cit., 464; Pound, "Individual Interests in the Domestic Relations," 14 Mich. L. Rev. 177 (1916). The law developed as an offshoot of the action for enticing away a servant and depriving the master of his quasi-proprietary interest in his services. The wife and minor children were considered, in early common law, as superior servants of the husband and father; loss of their services became the gist of his action. 8 Holdsworth, History of English Law (2d ed. 1937), 427 ff.; Wigmore, "Interference with Social Relations," 21 Am. L. Rev. 764 (1887). In recent years, however, the emphasis has shifted from services toward recognition of the more intangible elements in the domestic relation, such as companionship and affection. Prosser, Law of Torts (2d ed. 1955), § 103, p. 683.
Pound, in the cited article (page 181), observed that parents have three interests in their children that require protection against the world at large: (1) the society of their children  their custody, control and upbringing; (2) the chastity of the female child, connected with the honor of the family and the self-respect and mental comfort of the parent; and (3) the claim to a child's services, a purely economic claim not differing from the interest in other economic advantageous relations. Cf., 2 Wigmore, Select Cases on the Law of Torts (1912), "Summary of the Principles of Torts," § 30, p. 841. The second of these three interests was secured by an action for loss of services based in theory upon the economic interest of the parent with, as Pound puts it, "an incidental reparation for the more significant interest of the parent in the domestic relation."
The law has not always been as ready to protect the relation of parent and child as it has that of husband and wife. It has, perhaps, been most sensitive and given the broadest protection to the parent's interests in permitting the bringing *542 of an action for illicit intercourse with his female child. In the measure that such action redresses injury to family honor, reputation and the feelings involved in the father-child relation, it is somewhat analogous to the husband's action for criminal conversation. Unwilling to permit the woman a right to sue for her own seduction, the common law did what it could to give an action at least to the parent. The result was the action for seduction, supported by nothing more than a fiction which proved to be as embarrassing as it was ingenious.
It is unnecessary to detail every step of the road by which the common law arrived at the final product  an action in the parent for seduction of the daughter, based on loss of services due the parent as master from his daughter as servant. For various treatments of the historical background of the action, see Van Horn v. Freeman, 6 N.J.L. 322, 325-327, and note, 329-330 (Sup. Ct. 1796); the concurring opinion of Justice Pennington in Coon v. Moffitt, 3 N.J.L. 583, 590 [Reprint 169, 176] ff. (Sup. Ct. 1809); Prosser, Law of Torts (2d ed. 1955), § 103, p. 694. At first the action was trespass quare clausum fregit, the usual charge being breaking and entering the father's house and assaulting his daughter, getting her with child, per quod servitium amisit. Here the technical ground was the breaking and entering of the house; and seducing and getting the daughter with child, with loss of services resulting, was laid by way of aggravation, inter alia enormia. Later, the element of breaking and entering was omitted; the loss of services was the grievance complained of. The action developed as trespass or case for loss of services.
The father, therefore, was not permitted to bring an action simply for the debauching of his daughter, but if there were loss of services consequent thereon, the action would lie. Per quod servitium amisit was the gist of his case in all common law jurisdictions. The transparent nature of this legal fiction was recognized in our earliest cases. In Van Horn v Freeman (1796), above, 6 N.J.L., at page 325, Chief Justice Kinsey was moved to observe
*543 "* * * it is in general a mere fiction of the law, in order to give some kind of compensation for an injury of the most atrocious kind, which would otherwise be remediless. In these cases, generally speaking, little or no service is either performed by the daughter, or expected from her; and were it not for the highly respectable characters by whom this fiction has been supported and recognized, I should not hesitate to express my opinion, that it disgraces the jurisprudence of the country. Nevertheless, * * * I feel myself bound to adhere to a uniform course of precedents, and, in the present instance, I certainly shall not deviate from them. * * *"
Justice Pennington said in Coon v. Moffitt, above, 3 N.J.L., at page 590 [Reprint at pages 175-176], that "it is much to be lamented, that a specific action is not given [to the parent] for the injury, and that courts of law have been compelled to contrive a collateral, in lieu of a direct remedy." Chief Justice Beasley noted, in Ogborn v. Francis, 44 N.J.L. 441, 443 (Sup. Ct. 1882):
"* * * It is therefore the recognized doctrine that the parental relationship is no part of the basis of suits of this character; such suits, as their legal ground, rest exclusively on the relationship of master and servant. I shall not pause to inquire, as is done in some of the decisions in this country, whether this doctrine originated in a barbarous age, and is incompatible with the educated intelligence of our own times, for I cannot forget that the body of the common law had the same origin and much of it has been subject to the same criticisms, and that a court seeks to know what the law is and not what it should be. * * *"
The fiction did not go unnoticed in the jurisdiction of its origin, England. See Sergeant Manning's note to Grinnell v. Wells, 7 Man. & G. 1033, 1044, 135 Eng. Rep. 419, 424 (1844):
"It may be observed, however, that the quasi-fiction of servitium amisit affords protection to the rich man, whose daughter occasionally makes his tea, but leaves without redress the poor man, whose child, as here, is sent, unprotected, to earn her bread amongst strangers."
And see Pickle v. Page, 252 N.Y. 474, 169 N.E. 650, 72 A.L.R. 842 (Ct. App. 1930); Annotation, 72 A.L.R. 847 (1931).
*544 The courts of England have persisted in holding fast to the rule that the loss of services is essential to the parent's cause of action, Grinnell v. Wells, above; Whitbourne v. Williams [1901], 2 K.B. 722; and American courts, generally, have said that loss of services is the gist of the action, without which the action must fail. 47 Am. Jur., Seduction, § 73, p. 664; 79 C.J.S., Seduction, § 10, p. 964; Van Horn v. Freeman, Coon v. Moffitt, Ogborn v. Francis, above; Tittlebaum v. Boehmcke, 81 N.J.L. 697 (E. & A. 1911); Blackman v. Iles, 4 N.J. 82, 88 (1950). However, the tendency in this State, as elsewhere, has from the earliest times been to reduce this element of loss of services to a minimum. Van Horn v. Freeman, 6 N.J.L., at page 329; Coon v. Moffitt, 3 N.J.L., at page 586 [Reprint at page 172]. Any services actually rendered the parent, even of the slightest, such as making a cup of tea (Briggs v. Evans, 27 N.C. 16, 20 (Sup. Ct. 1844), or milking the cows (Bennett v. Allcott, 2 Term Rep. 166, 168 (1787); accord, Coon v. Moffitt, above), suffices. If the seduced daughter was a minor and living in her father's home, it was presumed without more that she performed such services, Noice v. Brown, 39 N.J.L. 569, 572 (Sup. Ct. 1877); cf. Magee v. Holland, 27 N.J.L. 86 (Sup. Ct. 1858) (abduction of infants aged 3-6 years); and even where a minor daughter temporarily lived elsewhere, the father could recover if he still had the legal right to command her services at his pleasure  i.e., had not emancipated her from his control, or released his right to her services, or abandoned her  Middleton v. Nichols, 62 N.J.L. 636, 637-638 (Sup. Ct. 1898); cf. Ogborn v. Francis, above. Thus, courts have embraced the idea of constructive service to support the father's action; the mere right to services was enough, though none were rendered in fact. 47 Am. Jur., Seduction, § 75, p. 666; 79 C.J.S., Seduction, § 10, p. 964 ff.
Not only have American courts been willing to support the fiction of loss of services by recognizing that the right to services without any being performed was sufficient, but the fact of services without the right to them has also been ample *545 to the purpose. This has been the approach where the daughter was of age at the time of her seduction. If she was in a position where the father could command her services, and she rendered them to him, no matter how slight, recovery would lie. 47 Am. Jur., Seduction, § 75, pp. 666-667, § 81, p. 671; 79 C.J.S., Seduction, § 10, p. 965; Sutton v. Huffman, 32 N.J.L. 58 (Sup. Ct. 1866); Noice v. Brown above, 39 N.J.L., at page 573; and see opinion of Justice Rossell in Coon v. Moffitt, above, 3 N.J.L., at page 588 [Reprint at page 174].
Realistically appraising the lengths to which courts have had to go in order to keep alive and useful the fiction of loss of services, a few jurisdictions logically concluded that the fiction was obsolete and no longer necessary to an action for seduction in the parent. Simpson v. Grayson, 54 Ark. 404, 16 S.W. 4 (Sup. Ct. 1891); Anthony v. Norton, 60 Kan. 341, 56 P. 529, 44 L.R.A. 757 (Sup. Ct. 1899); Snider v. Newell, 132 N.C. 614, 44 S.E. 354 (Sup. Ct. 1903); Dwire v. Stearns, 44 N.D. 199, 172 N.W. 69 (Sup. Ct. 1919); cf. Pickle v. Page, 252 N.Y. 474, 169 N.E. 650, 72 A.L.R. 842 (Ct. App. 1930) (abduction of grandchild), and Annotation, 72 A.L.R. 847 (1931). About one-third of the states enacted statutes to that effect. 4 Vernier, American Family Laws (1936), § 265, p. 461.
Technical loss of services once having been established, the parent's action for seduction was recognized (sub silentio) for what it really was  an action ex delicto for interference with the family relation. As was said in Briggs v. Evans, 27 N.C. 16, 20 (Sup. Ct. 1844), the plaintiff "comes into court as a master; he goes before the jury as a father." The father, suing as a master, has been permitted to recover not only the value of the services lost  often so minor as to be minimal  but damages for medical and other expenses for the care of the daughter, for loss of her society and comfort, for his wounded feelings, for the dishonor brought to himself and his family  with punitive damages imposed. Prosser, Law of Torts (2d ed. 1955), § 103, pp. 694-5. This was clearly recognized over half a century ago *546 in Middleton v. Nichols, above, 62 N.J.L., at page 640, where it was said:
"Whatever the anomaly may be between the basis of this action and the measure or elements of damages recoverable on such basis, it is well established now that not only is the value of the loss of service and the expenses of pregnancy and sickness recoverable, but compensation can be made to the parent for the humiliation and disgrace brought upon himself and his family, and for the mental anguish suffered by reason of the ruin of his daughter and the dishonor of his household. The loss of service is not the rule of damage. It has been said that `it is scarcely an item in the account.' The real ground of damage is the disgrace of the family. The loss of service in many, in most, instances could hardly be accounted anything, and yet often where the least service is, or can be, performed the highest damages can be given. The loss of service is but one step to that high plane of injury and wrong for which the parent is entitled to compensation. Damages are given to the plaintiff standing in the relation of parent. [Citing many cases.]"
There can therefore be no question that before 1935 plaintiff could have brought this action for seduction and recovered the damages he now seeks for loss of services and earnings, for medical and other expenses, and for shame and humiliation, upon a showing that his daughter was not emancipated, that he still had the right to command her services, and that he did in fact receive from her a measure of such services.

II.
Heydon's Case, 3 Co. Rep. 7a, 76 Eng. Rep. 637, decided in 1584, announced what has since been the accepted approach in the construction of statutes:
"* * * that for the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered: 
1st. What was the common law before the making of the Act.
2nd. What was the mischief and defect for which the common law did not provide.
3rd. What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.
And, 4th. The true reason of the remedy; * * *."
*547 We have already considered the state of the common law, in this jurisdiction and elsewhere. What was the mischief and defect that required correction?
The abuses attending the so-called "heart balm" actions  alienation of affections, criminal conversation, seduction and breach of promise to marry  have been considered elsewhere. See, generally, Feinsinger, Legislative Attack on "Heart Balm," 33 Mich. L. Rev. 979 (1935); Feinsinger, Current Legislation affecting Breach of Promise to Marry, Alienation of Affections and Related Actions, 10 Wis. L. Rev. 417 (1935); Kane, Heart Balm and Public Policy, 5 Ford L. Rev. 63 (1936); Kingsley, The Anti-Heart Balm Statute, 13 So. Cal. L. Rev. 37 (1939); Note, Avoidance of the Incidence of Anti-Heartbalm Statutes, 52 Columbia L. Rev. 242 (1952); Prosser, op. cit., § 103, p. 697. The public had come to look upon "heart balm" suits as devices for extracting large sums of money without proper justification. They were a fruitful source of coercion, extortion and blackmail. Manufactured suits, with their always present threat of publicity, were often used to force a settlement. Thus, an unscrupulous and unprincipled father could threaten to sue, or actually sue, a reputable or wealthy or important member of the community for an alleged act of seduction, timing his action so as to coincide with an important event in the man's life, such as the forthcoming announcement of his engagement, marriage, or his candidacy for public office. If the person charged stood his ground and went to court, he was faced with proof of damages grossly magnified to catch the sympathy of the jury. And juries were generally very liberal in their awards in seduction cases; damages could be and were oppressive, under the guise of punitive or exemplary damages  such as are sought here. As Prosser observes, there is good reason to believe that even genuine actions were "brought, more frequently than not, with purely mercenary or vindictive motives; that it is impossible to compensate for such damage with what has derisively been called `heart balm'; that people of any decent instincts do not bring an action which merely adds to the family disgrace; and that *548 no preventive purpose is served, since such torts seldom are committed with deliberate plan." Op. cit., page 697. Cf., Feinsinger, "Legislative Attack on `Heart Balm,'" 33 Mich. L. Rev. 979, 986-7 (1935), in criticizing statutes which expressly permitted the woman to sue for damages for her own seduction.
In the statement of policy set out in the preamble to L. 1935, c. 279 (now N.J.S. 2A:23-1 et seq.) our Legislature stated:
"Whereas, The remedies herein provided for by law for the enforcement of actions based upon alleged alienation of affections, criminal conversation seduction and breach of contract to marry have been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances, and such remedies having been exercised by unscrupulous persons for their unjust enrichment and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases have resulted in the perpetration of frauds, it is hereby declared as the public policy of the State of New Jersey that the best interests of the people of the State will be served by the abolition of such remedies. Consequently, in the public interest, the necessity for the enactment of this article is hereby declared as a matter of legislative determination; * * *."
We may consider this preamble as indicating the reasons which motivated the enactment, and refer to it in determining the legislative intention should any doubt arise concerning the construction to be placed on the act. Blackman v. Iles, above, 4 N.J., at page 90; Grobart v. Grobart, 5 N.J. 161, 166 (1950); Crawford, Statutory Construction (1940), § 205, p. 355.

III.
We next deal with the manner in which the New Jersey Legislature met the mischief inherent in the common law as it stood in 1935. Public opinion almost universally favored the abolition of the "heart balm" actions. Its resentment against the abuses incident to such suits led to a wave of legislative reform. Indiana led the way; Laws 1935, c. 208 *549 (Ind. Stat. Ann. (Burns 1946), § 2-508) abolished "All civil causes of action for breach of promise to marry, for alienation of affections, for criminal conversation, and for the seduction of any female person of the age of twenty-one years or more, * * *." New York acted next, Laws 1935, c. 263, Civil Practice Act, § 61-a to 61-i, abolishing "The rights of action heretofore existing to recover sums of money as damage for alienation of affections, criminal conversation, seduction, or breach of contract to marry, * * *." Illinois followed, and New Jersey soon after, L. 1935, c. 279 (N.J.S. 2A:23-1 et seq.) being modeled upon the language of the New York act. In all, 17 states, responding to the pressure generated by public opinion and publicity, enacted statutes designed to eliminate, modify or restrict one or more of the "heart balm" actions. Vernier, American Family Laws (1938 supp.), §§ 158, 252, 265; Note, "Avoidance of the Incidence of the Anti-Heartbalm Statutes," 52 Columbia L. Rev. 242. Not all of these statutes abolish the civil action for seduction. Eight make no reference to it (Illinois, Maine, Maryland, Massachusetts, Nevada, New Hampshire, Pennsylvania and Tennessee). Alabama, like Indiana, prohibits seduction actions where the woman is over 21; California and Michigan where she is over 18. Colorado, Florida, New York and Wyoming, like New Jersey, abolished the action for seduction.
These statutes have, with one exception, been upheld against all objections raised. Young v. Young, 236 Ala. 627, 184 So. 187 (Sup. Ct. 1938); Thome v. Macken, 58 Cal. App.2d 76, 136 P.2d 116 (D. Ct. App. 1943); Langdon v. Sayre, 74 Cal. App.2d 41, 168 P.2d 57 (D. Ct. App. 1946); Ikuta v. Ikuta, 97 Cal. App.2d 787, 218 P.2d 854 (D. Ct. App. 1950); Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419 (Sup. Ct. 1948); Kolkey v. Grossinger, 195 F.2d 525 (5 Cir., 1952); Pennington v. Stewart, 212 Ind. 553, 10 N.E.2d 619 (Sup. Ct. 1937); Thibault v. Lalumiere, 318 Mass. 72, 60 N.E.2d 349, 158 A.L.R. 613 (Sup. Jud. Ct. 1945); Ex parte Landaal, 273 Mich. 248, 262 N.W. 897 (Sup. Ct. 1935); Bean v. McFarland, 280 Mich. 19, 273 *550 N.W. 332 (Sup. Ct. 1937); Fearon v. Treanor, 272 N.Y. 268, 5 N.E.2d 815, 109 A.L.R. 1229 (Ct. App. 1936), reargument denied 273 N.Y. 528, 7 N.E.2d 677, 109 A.L.R. 1229, remittitur amended 273 N.Y. 645, 8 N.E.2d 36 (1937), appeal dismissed 301 U.S. 667, 57 S.Ct. 933, 81 L.Ed. 1332 (1936), rehearing denied 302 U.S. 774, 58 S.Ct. 6, 82 L.Ed. 600 (1937); Hanfgarn v. Mark, 274 N.Y. 22, 8 N.E.2d 47 (Ct. App. 1936), remittitur amended 274 N.Y. 570, 10 N.E.2d 556 (1937), appeal dismissed 302 U.S. 641, 58 S.Ct. 57, 82 L.Ed. 498 (1937); A.B. v. C.D., 36 F. Supp. 85 (D.C.E.D. Pa. 1940), affirmed 123 F.2d 1017 (3rd Cir. 1941), certiorari denied 314 U.S. 691, 62 S.Ct. 361, 86 L.Ed. 553 (1941); McMullen v. Nannah, 49 Pa. Dist. & Co. R. 516 (Pa. C.P. 1943). Contra, Heck v. Schupp, 394 Ill. 296, 68 N.E.2d 464, 167 A.L.R. 232 (Sup. Ct. 1946), where, in an alienation of affections action, the court struck down the entire statute (Smith-Hurd, Ill. Ann. Stat., c. 38, §§ 246.1-246.6, similar to the Indiana law), basing its decision on a somewhat unusual combination of state constitutional provisions. The rationale of the case has not been followed elsewhere. Thereafter, however, Illinois adopted legislation limiting recovery to actual damages, without consideration given to defendant's wealth, injury to plaintiff's feelings, etc., in alienation of affections, breach of promise and criminal conversation actions. Laws 1947, pp. 796, 800, 1181; Smith-Hurd, Ill. Ann. Stat., c. 68, §§ 34-40 and §§ 44-47; c. 89, §§ 25-33.
The obviously careful research of counsel for both parties, as well as our own, has disclosed no reported case of a civil action for seduction being maintained by a parent of an adult female in the states where seduction actions have been barred: Alabama, California, Colorado, Florida, Indiana, Michigan, New Jersey, New York and Wyoming. As defendant suggests, this is persuasive of the fact that such actions are no longer deemed to exist. The legislation appears to have had the desired effect. That so many states, including our own, have seen fit to abolish, restrict or limit some or all of the "heart balm" actions, including the action for *551 seduction, would seem to indicate that the statutes are salutary and have the force of public opinion behind them.
The constitutionality of the New Jersey act, L. 1935, c. 279 (N.J.S. 2A:23-1 et seq.), was under early attack in Bunten v. Bunten, 192 A. 727, 15 N.J. Misc. 532 (Cir. Ct. 1937), an alienation of affections action. The court held the statute was clearly within the legislative power and constitutional. Our present Supreme Court has inferentially upheld the statute in Blackman v. Iles, 4 N.J. 82 (1950); Rubenstein v. Lopsevich, 4 N.J. 282 (1950), and Grobart v. Grobart, 5 N.J. 161 (1950).
Although no one who has written on the subject has ever suggested that "heart balm" statutes are unconstitutional, their desirability has been questioned in some quarters. See, for example, Kane, Heartbalm and Public Policy, 5 Ford. L. Rev. 63, 67 (1936); Brown, The Action For Alienation of Affections, 82 U. of Pa. L. Rev. 472, 505 (1934), Notes 13 N.Y.U.L.Q. Rev. 104 (1935), and 30 Ill. L. Rev. 764 (1936).

IV.
The "true reason" (Heydon's Case, above, fourth point) for our law abolishing the rights of action formerly existing to recover sums of money for damage for alienation of affections, criminal conversation, seduction or breach of promise to marry, is the expressed desire of the Legislature to correct the mischiefs which attended the threat or the actual bringing of such actions, as outlined in II above. The Legislature thus left the punishment of the offending party to rest either in the moral law or in criminal law. N.J.S. 2A:142-1 designates as a high misdemeanor the seduction of a single female of good repute for chastity, by a married man under representation that he is single, or under promise of marriage, she thereby becoming pregnant. And N.J.S. 2A:142-2 designates as a high misdemeanor the seduction of a single female of good repute for chastity and under 21 years of age, by a single man over the age of 18, under a promise of marriage, she thereby becoming pregnant.
*552 L. 1926, c. 201, carried over into the Revised Statutes of 1937 as section 9:1-1 after the passage of our "Heart Balm" Act in 1935, is of no aid to the parent of a seduced adult daughter, for it gives the parents jointly a right to maintain an action for the loss of wages or services of their child, when such loss is occasioned by an injury wrongfully or negligently inflicted upon such child, only where the child is a minor. This statute was referred to in Blackman v. Iles, above, 4 N.J. at pages 89 and 92. Here we may also note that R.S. 2:27-70, which makes provision for the issuance of a capias ad respondendum in an action founded upon seduction, which section was likewise carried into the Revision of 1937 after the passage of the "Heart Balm" Act, does not now have the persuasive force assigned to it in the Blackman case (4 N.J. at pages 91-92). That case was decided in 1950. The revision of Title 2 of the Revised Statutes became effective January 1, 1952 (L. 1952, 1st Sp. Sess., c. 344), and N.J.S. 2A:15-41, successor to R.S. 2:27-70, no longer provides that a capias shall issue in an action founded upon seduction.
We consider that the Legislature has effectively ordained that money damages shall not be recovered by the father of an adult girl who has abandoned her virtue and become pregnant.

V.
We have demonstrated at some length in the first section of this opinion that by the common law of this State, and in most states, a right of action for seduction was given to a parent only, where the daughter was not emancipated and the parent still had the right to command her services and did in fact receive a measure of service from her. L. 1935, c. 279, sec. 1 (now N.J.S. 2A:23-1) provided that "The rights of action heretofore existing to recover sums of money as damage for the alienation of affections, criminal conversation, seduction, or breach of contract to marry are hereby abolished." (Italics ours.) No act done in this State after June 27, 1935 was to give rise to a right of action for seduction *553 N.J.S. 2A:23-2. The 1935 statute made it "unlawful for any person, either as a party or attorney, or an agent or other person in behalf of either, to file or serve, cause to be filed or served or threaten to file or serve, or to threaten to cause to be filed or served, any process or pleading, in any court of this State, setting forth or seeking to recover a sum of money upon any cause of action abolished or barred" by the act, whether such cause of action arose within or without this State. N.J.S. 2A:23-3. Any person violating any provision of the statute was guilty of a misdemeanor, punishable by fine not exceeding $1,000, or by imprisonment for not more than one year, or both. N.J.S. 2A:23-5. The Legislature expressly provided that the law "shall be liberally construed to effectuate the objects and purposes thereof and the public policy of the state as hereby declared." N.J.S. 2A:23-6. Nothing in the law was to be construed as a repeal of any of the provisions of the penal law or criminal procedure law or of any other law of New Jersey relating to criminal or quasi-criminal actions or proceedings. N.J.S. 2A:23-7.
There was but one action for seduction before 1935  the common law action residing in the parent who, as master, sued for damages for the seduction of his daughter, considered as his servant. N.J.S. 2A:23-1 preserved the language of section 1 of the 1935 act abolishing the action formerly existing to recover damages for seduction. This language could only refer to the common law action by the parent.
"Words and phrases having a well-defined meaning in the common law are to be interpreted in the same sense under the statute when used in connection with the same or similar subject matter with which they were associated at common law." 3 Sutherland, Statutory Construction (3d ed. 1943), § 5303, p. 9.
When the Legislature referred to the right of action "formerly existing to recover sums of money as damage for * * * seduction," N.J.S. 2A:23-1, N.J.S.A., it could not have referred to an action in the woman. She had no such action *554 at the common law, but only an action for breach of promise to marry, likewise abolished by the 1935 act. It could not have meant an action by the parent for seduction simply, for such direct type of action was not recognized in our common law. The meaning of the terms at the time of the enactment was intended. 82 C.J.S., Statutes, § 329, p. 636. "A legislative body in this State is presumed to be familiar not only with the statutory law of the State, but also with the common law." Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 350 (1953). There is a presumption against useless legislation, Tucker v. Frank J. Beltramo, Inc., 117 N.J.L. 72, 77 (Sup. Ct. 1936); a purposeful alteration of the existing law must be attributed to the Legislature.
Plaintiff contends that the statute, being in derogation of a common law right, must be strictly construed. The answer is that the Legislature, as noted, in express words directed that the law be liberally construed to effectuate its objects and purposes. L. 1935, c. 279, § 8 (now N.J.S. 2A:23-6); and see Blackman v. Iles, above, 4 N.J. at page 87. He strongly urges that this case is controlled by Blackman. We consider that case readily distinguishable. There the female seduced was 14 years old; there was a criminal assault upon her by the defendant, amounting to statutory rape. N.J.S. 2A:138-1; Blackman v. Iles, 4 N.J. at page 90. Defendant made no promise to marry the girl. The court permitted a suit by the parent for loss of services of his minor daughter, referring to R.S. 9:1-1 and 2:27-70, as support for its result. We have already discussed the inapplicability of these two statutes to the instant case.
Here the daughter was over age at the time of the alleged seduction. Defendant alone was not guilty of a crime; both the daughter and defendant were guilty of the crime of fornication, N.J.S. 2A:110-1  a crime rarely prosecuted, and one which, at least in the judgment of some members of the American Law Institute, should be abolished. See 78 N.J.L.J. 193 (June 9, 1955). Defendant could not be tried for the crime of seduction, because the daughter was over 21. N.J.S. 2A:142-2.
*555 The complaint in this case specifically alleges in paragraph 3 of the first count that defendant "did, under the promise of marriage, seduce the plaintiff's daughter," and as a result thereof she became pregnant. The father obviously seeks to justify or excuse the conduct of his daughter, but whether such testimony would be admissible or not does not change the fact that the pleading implicates a breach of promise to marry. The institution of marriage is therefore involved. There is thus brought into play the rationale of the various decisions, cited above, upholding the constitutionality of heart balm statutes. See, in particular, Fearon v. Treanor, Hanfgarn v. Mark, Rotwein v. Gersten, and Bunten v. Bunten, which were decided on the broad ground that a state legislature has plenary power in dealing with the subject of marriage and situations touching upon the marriage relation. And see Blackman v. Iles, above, 4 N.J. at page 92, where the court, in summarizing its discussion, said: "In viewing the act as a whole and the causes of action therein abolished, we think it clear they all pertain to the `status of marriage' and the rights, privileges, duties and obligations related to and flowing therefrom."
We are persuaded that the cause of action for seduction is intended for the redress of wrongful conduct, including loss of chastity by the female, with the consequent degradation, mortification, and wounded feelings visited upon her as well as upon her parents. Our "heart balm" statute was carefully drawn with the evident purpose, in our opinion, to wipe out a cause of action such as the one under consideration, where a father seeks to recover damages for the seduction of his adult daughter under a promise of marriage.
Although plaintiff contends to the contrary, we do not consider that the following cases undercut our conclusion. All of them deal with situations clearly outside the purview of the statute: Glazer v. Klughaupt, 116 N.J.L. 507 (E. & A. 1936) (suit to recover accumulated earnings under a contract of hire); Beberman v. Segal, 6 N.J. Super. 472 (Law Div. 1949) (suit to recover an engagement ring); Grobart v. Grobart, 5 N.J. 161 (1950) (action against *556 brothers- and sisters-in-law for malicious conspiracy to injure plaintiff in her marital relations, resulting in plaintiff being deprived of certain rights in her husband's property through fraud and deceit); Horby v. King, 13 N.J. Super. 395 (Law Div. 1951) (action to recover for assault and battery and expenses incurred by plaintiff in connection with the birth of her child); Devine v. Devine, 20 N.J. Super. 522, 90 A.2d 126 (Ch. Div. 1952) (action for injunctive relief to restrain mother-in-law from alienating the affections of plaintiff's husband; dictum); and Stickles v. Manss, 36 N.J. Super. 95 (Law Div. 1955) (action by widow against husband's mistress for libel).

VI.
Although the Attorney-General received notice that the constitutionality of N.J.S. 2A:23-1 et seq. was drawn in issue on this appeal, R.R. 4:37-2, he determined not to move to intervene or to participate on the appeal by filing a brief.
We find plaintiff's argument that if the statute be construed to bar him from maintaining his action, it is in that respect unconstitutional, without merit. Legislation is presumed valid and constitutional; no act is to be declared invalid unless its invalidity be made to appear clearly, palpably and free of reasonable doubt. State v. Dolbow, 117 N.J.L. 560, 565 (E. & A. 1937), appeal dismissed 301 U.S. 669, 57 S.Ct. 943, 81 L.Ed. 1334 (1937); O'Gorman & Young, Inc., v. Hartford Fire Insurance Co. of Hartford, Conn., 282 U.S. 251, 257, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163 (1931); 50 Am. Jur., Statutes, § 170, p. 149 ff. The burden of showing a palpable excess of legislative authority is upon plaintiff. 11 Am. Jur., Constitutional Law, § 132, p. 795 ff. He has not met this burden.
We have already referred to the contention that the statute, being in derogation of the common law, should be strictly construed, and have noted that N.J.S. 2A:23-6 specifically calls for a liberal construction "to effectuate the objects and purpose thereof and the public policy of the *557 state as hereby declared." N.J.S. 2A:23-1 et seq., being remedial legislation, should be liberally construed to effectuate the legislative intent, clearly expressed in the preamble, to abolish the common law action of seduction. As was observed in Preziosi v. Buonaccorsi, 16 N.J. Super. 15, 21 (App. Div. 1951), although the rule is that a statute in derogation of the common law must be strictly construed, "nevertheless it is equally axiomatic that this rule will not be permitted to defeat the obvious purpose of the Legislature or lessen the scope plainly intended to be given the measure."
The Legislature may validly abolish a common law right or remedy, prospectively, without furnishing an adequate substitute. Fearon v. Treanor, 272 N.Y. 268, 5 N.E.2d 815 (Ct. App. 1936), and Hanfgarn v. Mark, 274 N.Y. 22, 8 N.E.2d 47 (Ct. App. 1936), mentioned above, were both appealed to the United States Supreme Court, which in each case dismissed the appeal per curiam, 301 U.S. 667, 57 S.Ct. 933, 81 L.Ed. 1332, and 302 U.S. 641, 58 S.Ct. 57, 82 L.Ed. 498. In the Fearon case the opinion of the United States Supreme Court was: "The appeal herein is dismissed for the want of a substantial Federal question. Second Employers' Liability Cases, Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 50; 32 S.Ct. 169, 56 L.Ed. 327; New York C.R. Co. v. White, 243 U.S. 188, 198; 37 S.Ct. 247, 61 L.Ed. 667; Silver v. Silver, 280 U.S. 117, 122." The dismissal in the Hanfgarn case was in identical language, with the additional citation of "Fearon v. Treanor, 301 U.S. 667, 57 S.Ct. 933, 81 L.Ed. 1332." A reading of the cases cited by the United States Supreme Court discloses that the basis for the dismissal was that a state can abolish common law actions without substituting another remedy.
"A person has no property, no vested interest, in any rule of common law. That is only one of the forms of the municipal law, and is no more sacred than any other. * * * Indeed the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances." Munn v. State of Illinois, 94 U.S. 113, 134, 24 L.Ed. 77 (1876), cited with approval in Second Employers' Liability Cases, *558 Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 50, 32 S.Ct. 169, 56 L.Ed. 327 (1911).
A state has the constitutional and legislative power to change or modify the common law; the Constitution does not forbid the creation of new rights or the abolition of old ones recognized by the common law, if the purpose is to attain a permissible legislative object. 11 Am. Jur., Constitutional Law, § 196, p. 899. There can be no vested right in the continued existence of a statute or rule of the common law which precludes its change or repeal. 16 C.J.S., Constitutional Law, § 223, p. 646. New Jersey followed these principles in upholding the Workmen's Compensation Act in Sexton v. Newark District Telegraph Co., 84 N.J.L. 85, 92 (Sup. Ct. 1913), affirmed 86 N.J.L. 701 (E. & A. 1914), and adopted the language in Munn v. State of Illinois as controlling.
No constitutional objection may be raised to the abolition of the common law action where such abolition was for the public good. Ikuta v. Ikuta, above, 97 Cal. App.2d, at pages 789-790; Rotwein v. Gersten, above, 160 Fla., at page 739; A.B. v. C.D., above, 36 F. Supp., at page 87; and see Werner v. Southern California Associated Newspapers, 35 Cal.2d 121, 126, 216 P.2d 825, 13 A.L.R.2d 252 (Sup. Ct. 1950), appeal dismissed 340 U.S. 910, 71 S.Ct. 290, 95 L.Ed. 657 (1951), where the court said:
"It is settled that the Legislature may attack the evils of unfounded litigation by abolishing causes of action altogether. Thus statutes abolishing civil actions for alienation of affection, criminal conversation, seduction and breach of promise to marry have generally been upheld."
Our own State Constitution permits the common law to be changed. The Constitution of 1844 was in effect when the "Heart Balm" Act was passed in 1935, and Art. X, Schedule, par. 1, provided:
"The common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature; * * *."
*559 And see Constitution of 1776, Art. XXII. The Constitution of 1947, Art. XI, Schedule, Sec. I, par. 3, has similar language:
"All law, statutory and otherwise, * * * in force at the time this Constitution * * * takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise."
The framers of our Constitution realized that time inevitably brings changes. New situations arise; existing rules are found inadequate; sometimes the old rules become obsolete, cause oppression and result in injustice, so that they have to be abandoned. Our State Constitution provides for all this, for it clearly reveals that future legislatures have the right to enact laws of prospective application and which would meet new conditions as they evolved.
The cited provision in our several State Constitutions distinguishes New Jersey from other states whose constitutions prevent change of the common law. Plaintiff cites Coleman v. Rhodes, 5 W.W. Harr. 120, 35 Del. 120, 159 A. 649 (Super. Ct. 1932), in support of his contention that a legislature may not by statute deprive a person of a remedy for the invasion or deprivation of a property right without substituting another adequate remedy therefor. This case, and others that might be cited for the same proposition (see 11 Am. Jur., Constitutional Law, § 326, p. 1124, note 6) are not applicable because Delaware has a constitutional provision (Art. I, sec. 9) that "Every man for an injury done him in his reputation, person, * * * shall have a remedy by the due course of law." 1 Del. Code Ann. 174 (1953). See the discussion in Gallegher v. Davis, 7 W.W. Harr. 380, 37 Del. 380, 183 A. 620 (Super. Ct. 1936).
A traditional and recognized function of the Legislature is to inquire into facts dealing with the protection of the health, morals, safety and general welfare of the people, so that adequate remedial legislation may properly be prepared. The findings of the Legislature may be set forth by way of declaration of policy, and here these findings *560 were expressed in the preamble to the statute, quoted above in full. Ordinarily a legislative declaration of policy is final and binding upon the courts; only when the declaration is illusory and intended, under the cloak of police power, to mask some unreasonable or illegal purpose, may the court strike it down. A.P. Smith Mfg. Co. v. Barlow, 26 N.J. Super. 106, 124 (Ch. Div. 1953), affirmed 13 N.J. 145 (1953), certiorari denied 346 U.S. 861, 74 S.Ct. 107, 98 L.Ed. 373 (1953). As was said in Reingold v. Harper, 6 N.J. 182, 196 (1951):
"Factual support for the legislative judgment is to be presumed. Barring a showing contra, the assumption is that the measure rests upon some rational basis within the knowledge and experience of the Legislature. * * *"
The police power, as has so often been said, is an attribute of sovereignty and is inherent in every state. The power escapes exact definition, yet all rights and property are subject to it. Whatever is harmful to the public welfare may be restrained or prohibited, for the police power extends to the protection of the public peace, good order and morals.
The Legislature made an extended declaration of public policy in the preamble to the "Heart Balm" Act. The purpose of the legislation was stated to be the prevention of fraud, extortion, oppression and abuse of process. Such ends fall within the ambit of the police power of the State, so that legislation which will secure or tend to secure the public against the consequences of fraud, extortion, oppression and abuse of process is constitutional. "This reserve element of sovereignty embraces action conducive to social well-being." Schmidt v. Board of Adjustment of City of Newark, 9 N.J. 405, 415 (1952). See, generally, 11 Am. Jur., Constitutional Law, §§ 273, 274, pp. 1027, 1029 et seq.; 16 C.J.S., Constitutional Law, § 175, p. 541 et seq.
In Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 S.Ct. 186, 55 L.Ed. 112 (1911), Mr. Justice Holmes said:
*561 "It may be said in a general way that the police power extends to all the great public needs. * * * It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."
The same thought was expressed by Mr. Justice Cardozo, in his Growth of the Law (1924), page 134:
"Legislation can eradicate a cancer, right some hoary wrong, correct some definitely established evil, which defies the feebler remedies, the distinctions and the fictions, familiar to the judicial process."
The same Justice, in Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 42, 53 S.Ct. 431, 77 L.Ed. 1015 (1933), declared that:
"* * * It is not the function of a court to determine whether the public policy that finds expression in legislation of this order is well or ill conceived * * *. The judicial function is exhausted with the discovery that the relation between the means and end is not wholly vain and fanciful, an illusory pretense. Within the field where men of reason may reasonably differ, the legislature must have its way * * *. Nor in the marking out that field will a court be forgetful of presumptions that help to fix the boundaries. `As underlying questions of fact may condition the constitutionality of legislation of this character, the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.' O'Gorman & Young v. Hartford F. Insurance Co., 282 U.S. 251, 257, 51 S.Ct. 130, 72 A.L.R. 1163."
See Reingold v. Harper, above, 6 N.J., at page 195; State v. Monahan, 15 N.J. 34, 45-46 (1954); Dacunzo v. Edgye, 19 N.J. 443, 454 (1955).
We find that the police power having been properly exercized in the enactment of the "Heart Balm" Act, N.J.S. 2A:23-1 et seq., it offends no constitutional inhibition. The act is neither arbitrary nor unreasonable in its application to actions for seduction, and the present action in particular.
The judgment is affirmed.